## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

CONNECTUS LLC d/b/a EDEGREE ADVISOR

        Plaintiff,                  Case No.: 8:15-cv-02778-VMC-JSS

vs.

AMPUSH MEDIA, INC., and DGS EDU, LLC

        Defendants.

_____/

## AMENDED COMPLAINT

Plaintiff, CONNECTUS LLC d/b/a EDEGREE ADVISOR (hereinafter "Plaintiff" or "eDegree"), pursuant to F.R.C.P. 15, files its Amended Complaint against Defendants, Ampush Media, Inc., ("Ampush") and DGS EDU, LLC ("DGS EDU") (collectively "Defendants") and states as follows:

## NATURE OF ACTION

1.     Plaintiff brings this action based upon the Defendants' systematic practice of misappropriating and converting Plaintiff's proprietary lead generation data and exploiting the misappropriated proprietary lead generation data by mass calling Plaintiff's customers and / or selling the misappropriated data to third parties who mass call Plaintiff's customers.  As a result, Plaintiff has suffered significant financial harm as well as destruction of its goodwill.  Plaintiff sues herein for civil theft, conversion, violations of the Florida Uniform Trade Secrets Act, unfair competition, violation of the Florida Deceptive and Unfair Trade Practices Act, violation of the Federal Wiretap Act, unjust enrichment, breach of contract and injunctive relief.  Plaintiff seeks damages as well as injunctive relief.

## PARTIES, JURISDICTION AND VENUE

2.      Plaintiff, eDegree is a Delaware limited liability company with its principal place of business located at 28100 US Highway 19, Suite 204, Clearwater, Florida 33761.

3.      Defendant, Ampush is a Delaware corporation with its principal place of business located at 450 9th Street, 2nd Floor, San Francisco, California, 94103.

4.      eDegree's sole member is Digital Media Solutions, LLC ("DMS"), a Delaware limited liability company with its principal place of business located at 28100 US Highway 19, Suite 204, Clearwater, Florida 33761.

5.      The members of DMS are an individual who is domiciled in Florida, and Prism Data, LLC.  Prism Data, LLC is a Delaware limited liability company with its principal place of business located at 28100 US Highway 19, Suite 204, Clearwater, Florida 33761.

6.      Prism Data, LLC's membership consists of three individuals, two of whom are domiciled in Florida and one of whom is domiciled in Pennsylvania.  Citizenship of a natural person for purposes of 28 U.S.C. §1332 is equivalent to domicile, the place where the person has their permanent home and principal establishment.  *McCormick v. Aderholt*, 293 F.3d 1254, 1257 (11th Cir. 2002)  Therefore, Prism Data, LLC is a citizen of Florida and Pennsylvania.  *See, Rolling Greens MHP, L.P. v. Comcast SCH Holdings L.L.C.*, 374 F.3d 1020, 1022 (11th Cir. 2004) ("a limited liability company is a citizen of any state of which a member of the company is a citizen").

7.      Based on the above, the sole member of Plaintiff, DMS, is a citizen of Florida and Pennsylvania.  Therefore, Plaintiff, eDegree is a citizen of Florida and Pennsylvania.  *See, Rolling Greens MHP,* 374 F.3d 1020.

8.      Defendant, Ampush is a Delaware corporation with its principal place of business located at 450 9th Street, 2nd Floor, San Francisco, California, 94103.  Therefore, Ampush is a citizen of Delaware and of California under 28 U.S.C. §1332(c)(1).

9.      Defendant, DGS EDU is a Delaware limited liability company.  DGS EDU is wholly owned by Digital Globe Services, Inc.  Digital Globe Services, Inc. is a Delaware corporation with its principal place of business in California.  Thus DGS is a citizen of Delaware and California under 28 U.S.C. §1332(c)(1).

10.     Pursuant to the above information, this Court has jurisdiction over the subject matter of this action under 28 U.S.C §1332 on the grounds that the matter in controversy is between citizens of different states, and the amount in controversy exceeds the sum of $75,000, exclusive of interests and costs.

11.     The action is properly venued in this district pursuant to 28 U.S.C. § 1391(b)(2).

## FACTUAL BACKGROUND

12.     Plaintiff operates as an online marketplace which serves as an informational service that seeks to connect prospective students ("Prospective Student") with educational opportunities ("University" or "Universities").

13.     Plaintiff operates a number of proprietary websites where it generates high value, opt-in data of Prospective Students interested in furthering their education.  This process is referred to as lead generation.  The data acquired from the Prospective Students is extraordinarily proprietary and highly valued by Universities seeking to acquire Prospective Students.

14.     Once a Prospective Student agrees to be contacted by Plaintiff to discuss educational opportunities, Plaintiff engages its call center to contact these Prospective Students in order to collect further information and to help determine the best University match.  These

Potential Students, as well as the proprietary data acquired therefrom, are generally referred to by the Universities as Leads (hereinafter "Leads" or "Lead").

15.     Plaintiff, in some cases, does not have a direct relationship with the Universities themselves, but instead has relationships with intermediaries ("Aggregators"), who in turn have relationships with one or several Universities.  Ampush was one such Aggregator.

16.     Each Aggregator maintains a portal, which is essentially a database detailing the various programs offered by each University that it represents.

17.     Since Plaintiff works with many such Aggregators, in order to determine the best match or matches for each Potential Student, Plaintiff must "ping" data relating to each Prospective Student against each Aggregator's portal.   This step is referred to as the "Ping/Search Stage."   A portal is searched only to determine whether an Aggregator has a relationship with a University that is a potential match for the Prospective Student.

18.      If a potential University match is found, Plaintiff obtains further information from the Prospective Student, confirms the match and has the Prospective Student agree to various disclosures.   After all of these steps are completed, Plaintiff sells the Lead to the appropriate Aggregator or Aggregators, who in turn sell the lead to the University with which the Prospective Student was matched.

19.     Under no circumstances does Plaintiff submit or sell Leads to Aggregators at the Ping/Search Stage.  Instead, the Ping/Search Stage is an intermediary step in the Lead generation process, the sole function of which is to determine whether an appropriate University match may exist within a given portal so that Plaintiff can subsequently proceed with completion of generating the Lead.

20.     Plaintiff enters into contracts with Aggregators that govern the sale of Leads. Plaintiff and Defendant entered into such an agreement, the Ampush Media Service Level Agreement (the "Agreement") on May 31, 2013.  Pursuant to paragraph 5 of the Agreement Defendant agreed not to make use of, disseminate or in any way disclose Plaintiff's confidential information to any person, firm or business except as authorized in the Agreement.  A copy of the Agreement is attached hereto as **Exhibit "A."**

21.     On or about October 31, 2013, DGS EDU acquired the education business of Ampush, including the Agreement with Plaintiff, and Plaintiff continued to provide Leads to DGS EDU as set forth above.  DGS EDU is Ampush's successor in interest and Ampush and DGS EDU are referred to herein collectively as Defendants.

22.     Over time, Plaintiff began to receive complaints from Aggregators other than Defendants as well as Universities Plaintiff works directly with regarding the quality of the Leads that Plaintiff sold them.  A common complaint was that the Prospective Students had already been called multiple times by other Universities before these Aggregators and the Universities they represent were able to utilize the Lead they purchased.

23.     Accordingly, Plaintiff undertook a thorough investigation in an attempt to uncover the root cause of the Aggregators' complaints.

24.     As part of Plaintiff's investigation, Plaintiff tested its other Aggregator partner portals to ensure that consumer data which was not matched through the Ping/Search was not being used by Aggregators or the Aggregators' partners to call Prospective Students.

25.     Plaintiff's investigation revealed that rather than purchasing the Leads at the end of the client verification process, Defendants had been scraping, digitally copying or otherwise misappropriating Plaintiff's proprietary Lead generation data early in Plaintiff's Lead generation

process, at the Ping/Search Stage, but before Plaintiff had submitted or sold the Lead to Defendants.

26.     Upon information and belief, Defendants have used "scraping" software or other digital means to mine and misappropriate Plaintiff's proprietary Lead generation data and trade secrets.

27.     Plaintiff's investigation further revealed that Defendants had unlawfully sold the misappropriated Lead generation data to several of Defendants' third party partners.

28.     Plaintiff's investigation revealed that Defendants, and entities to which Defendants sold stolen Lead generation data, had been calling every Prospective Student whose information Plaintiff had utilized to conduct a Ping/Search on Defendants' portal, regardless of whether the Lead had ultimately been submitted or sold to Defendants.

29.     Plaintiff's investigation determined that Defendants and the partners to which it sells Lead generation data, have called as many as 838,853 Prospective Students after improperly obtaining Plaintiff's proprietary Lead generation data in the manner described above.

30.     Upon information and belief, each Prospective Student has been called dozens or scores of times.

31.     Although Defendants paid Plaintiff for approximately 39,975 Leads pursuant to the Agreement, Defendants have not paid Plaintiff for any of the 838,853 stolen Leads that Defendants obtained from using the scraping software described above.  Each stolen Lead has a value between $18.00 to $24.00 per Lead and thus Plaintiff's damages exceed $19,000,000.00, without taking into account the damage to Plaintiff's reputation and goodwill.

32.     As a result of the Defendants' acts, Plaintiff has been, and continues to be damaged monetarily and its goodwill continues to be irreparably harmed.

## <u>COUNT I – CIVIL THEFT UNDER FLA. STAT. §772.11</u>

33.     Plaintiff realleges and incorporates by reference the allegations contained in Paragraphs 1 through 25 as if specifically set forth herein.

34.     At the Ping/Search Stage of the Lead generation process, Plaintiff owns and has the exclusive right to possess its proprietary Lead generation data.

35.     Defendants knowingly obtained Plaintiff's property by scraping, digitally copying and misappropriating Plaintiff's proprietary Lead generation data at the Ping/Search Stage.

36.      Defendants knowingly obtained Plaintiff's proprietary Lead generation data with felonious intent to deprive Plaintiff of the benefit to the proprietary Lead generation data by failing and otherwise refusing to properly remunerate Plaintiff for the proprietary Lead generation data.

37.     Defendants knowingly obtained Plaintiff's proprietary Lead generation data with felonious intent to appropriate Plaintiff's property to Defendants' use by directly and/or indirectly contacting Prospective Students whose information Defendants had scraped, digitally copied and otherwise misappropriated from Plaintiff.

38.     Defendants knowingly obtained Plaintiff's proprietary Lead generation data with felonious intent to appropriate Plaintiff's property to the use of Defendants' partners by selling the misappropriated Lead generation data to such third parties.

39.     As a result of Defendants' theft of Plaintiff's proprietary Lead generation data, Plaintiff has suffered and will continue to suffer damages including lost revenue and profits, as well as damage to its goodwill.

40.    Plaintiff has made a pre-suit demand of Defendants for payment of treble damages that have resulted from Defendants' theft of Plaintiff's proprietary Lead generation data, but Defendant has failed and refused to comply with Plaintiff's demand.

41.    By reason of the foregoing, Plaintiff has suffered and continues to suffer damages.

42.    Pursuant to Fla. Stat. § 772.11(1), Plaintiff is entitled to a civil remedy for treble damages of Plaintiff's actual damages resulting from Defendants' theft of Plaintiff's proprietary Lead generation data.

WHEREFORE, Plaintiff, eDegree respectfully requests that this Court enter judgment in favor of Plaintiff and against Defendants for civil theft, and award Plaintiff treble damages in an amount equal to threefold Plaintiff's actual damages, attorneys' fees, costs and interest, and grant Plaintiff all other relief the Court deems appropriate.

## COUNT II - CONVERSION

43.    Plaintiff realleges and incorporates by reference the allegations contained in Paragraphs 1 through 25 as if specifically set forth herein.

44.    At the Ping/Search Stage of the Lead generation process, Plaintiff owns and has the exclusive right to possess its proprietary Lead generation data.

45.    Defendants intentionally interfered with Plaintiff's exclusive ownership and possessory rights by scraping, digitally copying and otherwise misappropriating Plaintiff's proprietary Lead generation data at the Ping/Search Stage.

46.    Defendants' scraping, digital copying and misappropriation of Plaintiff's proprietary Lead generation data at the Ping/Search Stage wrongfully deprived Plaintiff of the rightful ownership of its property.

47.     Defendants exercised dominion over Plaintiff's property through the scraping, digital copying and misappropriation of Plaintiff's proprietary Lead generation data at the Ping/Search Stage.

48.     Defendants assumed the powers of ownership over Plaintiff's property through unauthorized scraping, digital copying and misappropriating Plaintiff's proprietary Lead generation data at the Ping/Search Stage, and then exploiting said data for pecuniary gain.

49.     Plaintiff's investigation of Defendants' illegal conduct has revealed that Defendant's exercise of dominion over Plaintiff's proprietary Lead generation has been ongoing for a substantial period of time, possibly as early as the beginning of the parties' relationship.

50.     As a result of Defendants' unauthorized interference with Plaintiff's exclusive ownership and possessory rights to its proprietary Lead generation data, Plaintiff has suffered and will continue to suffer damages including lost revenue and profits.

51.     By reason of the foregoing, Plaintiff has suffered and continues to suffer damages.

WHEREFORE, Plaintiff, eDegree respectfully requests that this Court enter judgment in favor of Plaintiff and against Defendants for damages including all compensatory, special and punitive damages, costs and interest, and grant Plaintiff all other relief the Court deems appropriate.

## COUNT III - MISAPPROPRIATION OF TRADE SECRETS

52.     Plaintiff realleges and incorporates by reference the allegations contained in Paragraphs 1 through 25 as if specifically set forth herein.

53.     Plaintiff's proprietary Lead generation data constitute trade secrets within the meaning of Fla. Stat. § 688.002 (4).  Plaintiff took reasonable steps to protect the secrecy of its Lead generation data, including but not limited to entering into confidentiality agreements and

limiting access to its proprietary data.  The Lead generation data derived economic value from not being readily ascertainable by proper means to others that could obtain economic value from the disclosure and use of the Lead generation data.

54.     Defendants have misappropriated Plaintiff's confidential and proprietary Lead generation data by acquiring such data through improper means within the meaning of Fla. Stat. § 688.002 (2)(a) by exceeding any conceivable authorized valid access to data at the Ping/Search Stage.

55.     Defendants used improper means to acquire knowledge of Plaintiff's proprietary Lead generation data by exceeding its authorized accessed to such data by unlawfully "scraping" Plaintiff's proprietary Lead generation data at the Ping/Search Stage, and subsequently using and/or disclosing such data without the express or implied consent of Plaintiff.

56.     The foregoing acts of Defendants constitute willful and malicious misappropriation of Plaintiff's trade secrets.

57.     By reason of the foregoing misappropriation of Plaintiff's trade secrets, Defendants have been unjustly enriched at Plaintiff's expenses, and Plaintiff has suffered damage and continues to suffer damage.

WHEREFORE, Plaintiff, eDegree respectfully requests that this Court enter judgment in favor of Plaintiff and against Defendants for damages under Fla. Stat. §§ 688.03 and 688.04, including injunctive relief, and exemplary damages, attorneys' fees, costs and interest, and grant Plaintiff all other relief the Court deems appropriate.

## COUNT IV –UNFAIR COMPETITION

58.     Plaintiff realleges and incorporates by reference the allegations contained in Paragraphs 1 through 25 above as if specifically set forth herein.

59.     Defendants have been misappropriating and subsequently using and/or disclosing to third parties Plaintiff's confidential and proprietary Lead generation data for pecuniary gain and to solicit Prospective Students.

60.     The acts of Defendants complained of above, as well as other wrongful and fraudulent acts by Defendants that Plaintiff anticipates it will uncover during discovery, were committed in bad faith by Defendants and have, and will continue to, unjustly enrich Defendants at Plaintiff's expense, causing loss of revenue and profit, and irreparable harm to Plaintiff's goodwill.

61.     Further, Defendants' acts as described in detail herein will likely confuse and deceive the public and Prospective Students.

62.     Defendants have improperly benefitted from the misappropriation of Plaintiff's confidential and proprietary Lead generation data.

63.     Defendants' actions are willful, wanton and in reckless disregard of the rights of Plaintiff.

64.     The acts of Defendants complained of above constitute unfair competition.

65.     By reason of the foregoing, Plaintiff has suffered and continues to suffer damages.

WHEREFORE, Plaintiff, eDegree respectfully requests that this Court enter judgment in favor of Plaintiff and against Defendants for damages including all compensatory, special and punitive damages, costs and interest, and grant Plaintiff all other relief the Court deems appropriate.

## COUNT V – VIOLATION OF FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTICES ACT

66.     Plaintiff realleges and incorporates by reference the allegations contained in Paragraphs 1 through 25 above as if specifically set forth herein.

67.     Defendants' improper theft and misappropriation of Plaintiff's Lead generation data is a deceptive and unfair trade practice under Fla. Stat. §501.204.

68.     Defendants' conduct as described above is immoral, unethical, oppressive, unscrupulous and substantially injurious to Plaintiff, the Aggregators, the Universities and the Prospective Students.

69.     As a result of Defendants' deceptive and unfair trade practices alleged herein Plaintiffs have suffered actual losses and continue to suffer actual losses in the form of irreparable injury and damages.

WHEREFORE, Plaintiff, eDegree respectfully requests that this Court enter judgment in favor of Plaintiff and against Defendants for injunctive relief and damages, attorneys' fees, costs and interest, and grant Plaintiff all other relief the Court deems appropriate.

## COUNT VI – VIOLATION OF FEDERAL WIRETAP ACT

70.     Plaintiff realleges and incorporates by reference the allegations contained in Paragraphs 1 through 25 above as if specifically set forth herein.

71.     Plaintiff's Ping/Search of Defendants' portal at the Ping/Search Stage constitutes an electronic communication within the meaning of 18 U.S.C. § 2510(12).

72.     Defendants' scraping, digital copying and misappropriation of Plaintiff's proprietary Lead generation data at the Ping/Search Stage constitutes an intentional interception of Plaintiff's electronic communication in violation of 18 U.S.C. § 2511(1)(a).

73.     As a direct result of the foregoing, Plaintiff has suffered actual and consequential damages, and continues to suffer actual and consequential damages.

WHEREFORE, Plaintiff, eDegree respectfully requests that this Court enter judgment in favor of Plaintiff and against Defendants pursuant to 18 U.S.C. § 2520(b)(2), including

injunctive relief and damages including all compensatory, special and punitive damages, attorneys' fees, costs and interest, and grant Plaintiff all other relief the Court deems appropriate.

<u>**COUNT VII – UNJUST ENRICHMENT**</u>

74.     Plaintiff realleges and incorporates by reference the allegations contained in Paragraphs 1 through 25 above as if specifically set forth herein.

75.     Defendants have improperly misappropriated Plaintiff's proprietary Lead generation at the Ping/Search Stage without proper remuneration to Plaintiff.

76.     Thereafter, Defendants contacted and solicited Prospective Students, in addition to having sold and otherwise systematically exploited the misappropriated proprietary Lead generation data.

77.     Due to Defendants' deceptive practices, as well as other wrongful and fraudulent acts by Defendants which Plaintiff anticipates it will further uncover during discovery, Defendants has willfully and unjustly sold products, services and otherwise profited at Plaintiff's expense.

78.     Plaintiffs, albeit unknowingly, have conferred a benefit on Defendants by Defendants' access to Plaintiff's Lead generation data. Defendants had knowledge of the benefit conferred.  Defendants voluntarily accepted and retained the benefit conferred under such circumstances that it would be inequitable for the Defendants to retain the benefit without paying the value thereof to the Plaintiff.

79.     By reason of the foregoing, Plaintiff has suffered damages and continues to suffer damages.

WHEREFORE, Plaintiff, eDegree respectfully requests that this Court enter judgment in favor of Plaintiff and against Defendants for damages including all compensatory and special damages, costs and interest, and grant Plaintiff all other relief the Court deems appropriate.

## COUNT VIII – BREACH OF CONTRACT

80.     Plaintiff realleges and incorporates by reference the allegations contained in Paragraphs 1 through 25 above as if specifically set forth herein.

81.     Defendants breached the Agreement by improperly disclosing, disseminating and utilizing Plaintiff's Confidential Information in violation of the Agreement.

82.     As a result of Defendants' breach of the Agreement Plaintiff has suffered damage and continues to suffer damage.

WHEREFORE, Plaintiff, eDegree respectfully requests that this Court enter judgment in favor of Plaintiff and against Defendants for damages including all compensatory and special damages, attorneys' fees, costs and interest, and grant Plaintiff all other relief the Court deems appropriate.

## COUNT IX – INJUNCTIVE RELIEF

83.     Plaintiff realleges and incorporates by reference the allegations contained in Paragraphs 1 through 25 above as if specifically set forth herein.

84.     As a result of Defendants' conduct as described above, Plaintiff has suffered and will continue to suffer irreparable damages unless Plaintiff is granted injunctive relief.

85.     If Plaintiff is unable to stop Defendants and its agents, servants, employees, and those acting in concert with Defendants, from contacting Prospective Students whose Lead generation data was misappropriated by Defendants, Plaintiff will suffer irreparable harm, including irreparable damage to Plaintiff's goodwill.

86.     For this harm and damage, Plaintiff has no adequate remedy at law.

87.     These damages are continuing and, to a large degree, will be incalculable.

88.     Plaintiff therefore requests that the Court enter a preliminary and permanent injunction enjoining Defendants, their agents, servants, employees, and those acting in concert with Defendants, from calling or contacting in any way any and all consumers whose Lead generation data was misappropriated from Plaintiff by Defendants.

WHEREFORE, Plaintiff, eDegree respectfully requests that this Court enter judgment in favor of Plaintiff and against Defendants as follows:

(i)     Ordering that Defendants be preliminarily and permanently enjoined and restrained from calling or contacting in any way any and all customers whose Lead generation data has been misappropriated by Defendants;

(ii)     Permanently enjoining Defendants, and their agents, representatives, employees and anyone acting for or in concert with them or on their behalf, from calling or contacting in any way any and all customers whose Lead generation data has been misappropriated by Defendants;

(iii)     Ordering that Defendants to return the stolen Leads to Plaintiff; and

(xii)     Ordering such further relief as this Court deems just and proper, including Plaintiff's costs and attorneys' fees.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury trial on all issues so triable.

DATED:          December 11, 2015.

BARNETT, BOLT, KIRKWOOD,
LONG & KOCHE

/s/ Thomas G. Long
Thomas G. Long
Florida Bar No. 367321
Amy E. Stoll
Florida Bar No. 150959
601 Bayshore Boulevard
Suite 700
Tampa, FL  33606
(813) 253-2020 Telephone
(813) 251-6711 – Facsimile
*Attorneys for the Plaintiff*
Attorney's Email: tlong@barnettbolt.com
                           astoll@barnettbolt.com
Secondary Email: jhicks@barnettbolt.com
                           lharrod@barnettbolt.com



<u>**Ampush Media Service Level Agreement**</u>

1.    **INTRODUCTION**

1.1    **Scope**

This Service Level Agreement (this "Agreement"), entered into on May 31, 2013, by and between Ampush Media, Inc. ("AMPUSH") and EDegreeAdvisor, LLC ("VENDOR") governs the rights and responsibilities of the foregoing parties with respect to the call center services provided by VENDOR to AMPUSH at all times throughout the course of their business relationship (the "Service Period").

1.2    **Parties to the Agreement**

The following table describes and names the legal entities and their representatives who have reviewed and approved this Agreement.

| Entity | Address | Representative |
|---|---|---|
| Ampush Media | 450 9th Street, 2nd Floor, San Francisco, CA 94103 | Stewart Kuhlo |
| EDegreeAdvisor, LLC | 28100 US HIGHWAY 19 N STE 204 CLEARWATER, FL 33761 | Fernando Borghese |

1.3    **Perspective – Regulative Environment**

A number of documents specify the requirements for the provision of leads by VENDOR.  These include:

- Monthly insertion orders

1.4    **Definitions**

Qualified Lead:       All leads submitted to Ampush must contain the following:
  i.   Campus Name;
  ii.  Last Name of Lead;
  iii. First Name of Lead;
  iv.  Lead IP Address;
  v.   Lead Address;
  vi.  Lead City;
  vii. Lead State;
  viii. Lead Zip Code;
  ix.  Lead Country;
  x.   Lead Phone Number;
  xi.  Lead Phone Number Designation;
  xii. Lead Email Address;

1

xiii.   Program/Area of Interest Requested;
xiv.   Date/Time Company generates the Lead;
 xv.   Level of Education;
xvi.   GED/High School Graduation Year;

Intellectual Property Rights:   Means rights in copyrights, trade secrets, trademarks (including service marks), patents, mask works, industrial design rights, rights of priority, know-how, methodologies, in each case whether registered or unregisted, and including any application for registration of any of the foregoing, and all rights and forms of protection of a similar nature or having equivalent or similar effect to any of these, which may exist anywhere in the world.

Confidential Information:   Means any confidential or proprietary informaiton, source code, software tools, designs, schematics, plans or any other information relating to any research project, work in process, future development, scientific, engineering, manufacturing, marketing or business plan or financial or personnel matter relating to either party, its present or future products, sales, suppliers, clients, client lists or other client information, employees, investors or business, disclosed by one party to the other party, whether in oral, written, graphic or electronic form, and whose confidential or proprietary nature is identified at the time of such disclosure or by the nature of the circumstances surrounding disclosure should reasonably be understood to be confidential.

## 2.   SERVICES AND SERVICE LEVELS

### 2.1   Service Description

During the Service Period, VENDOR shall make outbound telephone calls in an effort to generate leads on behalf of AMPUSH.

### 2.2   File Delivery Expectations

VENDOR agrees to meet the delivery standards listed below:

| File Type | Expected Frequency/Minimum Frequency | Arrives at AMPUSH no later than: | Transport Method |
|---|---|---|---|
| Qualified leads | Variable. | At the time of creation. | Submission through AMPUSH web portal |
| Qualified lead audio | Daily/Within 48 hours | Forty-eight (48) hours from the time of lead creation | AMPUSH FTP |

2

| | | | |
|---|---|---|---|
| | | | |

**2.3 Service Level Indications**

The following measures will be used to assess VENDOR's performance of the service:

| Measure | Description | Target |
|---|---|---|
| Scripting | AMPUSH will work with VENDOR to develop appropriate scripting with the expectation that such scripting will be used by VENDOR's Call Center Representatives ("CCRs") on each outbound call made on behalf of AMPUSH. AMPUSH reserves the right to test and alter scripts in accordance with its unique strategy. VENDOR will implement any changes or amendments to the scripts within twenty four hours of submission by AMPUSH. | 100% |
| Call Recordings | All calls must be recorded at all times. All audio recordings on which a lead was submitted to AMPUSH's Lead Management System ("LMS") will be made available via VENDOR's FTP site within forty-eight (48) hours of the time of creation. Any lead(s) generated for which there is no accompanying audio within forty-eight (48) hours shall be considered unqualified and will not billable. If, for any reason, VENDOR is unable to record calls, experiences recording disruption or is otherwise unable to produce copies of recorded calls, Ampush must be notified within four (4) business hours of the time of discovery of the issue. VENDOR must maintain compliance with all state and federal regulations regarding consumer notification of call recording. | 100% |
| Qualified Leads Per Consumer | AMPUSH shall only pay for Qualified Leads as defined above. VENDOR may submit a single consumer's personal information to no more than three (3) schools. Any leads on which a consumer's personal information is submitted to more than three (3) schools will be considered unqualified and will not be paid. | 100% |
| Do-not-call restrictions | AMPUSH will not accept leads generated from "cold calls" or any form of contact where the consumer has not provided express prior permission to be contacted on behalf of educational institutions. | 100% |
| Outbound caller ID | VENDOR is required to transmit or display a valid, working telephone number for caller ID purposes. Return calls to that number during operating hours must provide consumers with an opportunity to be removed from the call list. The phone number appearing on the caller ID must be disclosed to AMPUSH. | 100% |
| Lead traffic and data sources | a. If consumer data is captured on a VENDOR-owned Web site, VENDOR must disclose the privacy policy for each site.<br>b. If consumer data is acquired by other methods such as acquiring information offline or acquiring data from non-VENDOR Web sites, VENDOR must disclose to AMPUSH the method through which the consumer data is captured, though not the source.<br>c. AMPUSH will NOT accept Leads generated from third party lists, i.e., rented lists. Leads generated in this manner shall be deemed Unqualified Leads. | 100% |
| Updates and compliance | All updates or call procedure changes requested by AMPUSH concerning the practices of the VENDOR'S call center or the CCRs | 98% |

| | must be made within twenty-four (24) hours of the request. | |
|---|---|---|
| Required notifications | The school name, school-specific degree, and program name (*e.g.*, Acme's AAS Degree in Medical Billing and Coding) must be provided to the consumer before submitting the AMPUSH lead form. Additionally, prior to submitting the lead form, the CCR must obtain the consumer's express permission to submit the form. | 100% |
| Expressed Disinterest | When speaking with a CCR, if a consumer states twice that they are not interested in being contacted about or pursuing educational opportunities, or in any other way expresses that they do not want to continue the call, the call must be terminated expeditiously and without submitting a consumer's personal information to any AMPUSH Client. VENDOR may not call the consumer again unless a new expression of interest is received. | 98% |
| Matching consumers to schools and programs | A CCR must always attempt to match the consumer to the program and/or school preference indicated by the consumer's responses to the pre-qualification questions.  If the consumer is unqualified for their preferred school or program, or if such school or program is unavailable, then the CCR may suggest alternative schools or programs; however, at all times the CCR must clearly communicate which school and program are being offered. If the consumer is unqualified, or will not accept a match to, the school or programs available, the call must be terminated appropriately without submitting any lead form(s). | 97% |
| Regulatory compliance | VENDOR shall comply with all applicable state and federal laws, rules, and regulations (collectively "Laws"), including, but not limited to, Laws relating to deceptive telemarketing, abusive telemarketing, do-not-call prohibitions, use of automated telephone equipment and consumer privacy rights. | 100% |
| Issue Resolution | VENDOR shall resolve all critical and major issues pertaining to individual CCR performance, dialer/platform performance or quality control feedback within one (1) business day. | Greater than 97% |
| | | |

## 3. MANAGEMENT ELEMENTS

### 3.1 Reviews

VENDOR will provide for a weekly review of its services with AMPUSH.

### 3.2 Change Process

Either party may propose changes to the scope, nature or time schedule of the Services being performed under this Agreement.  The parties will mutually agree to any propsed changes, including adjustments to fees and expenses as a result of the changes to this Agreement.  All changes are required to be submitted in writing by the party requesting the change, and a decision must be rendered by the party against whom the change is requested within a reasonable time, not to exceed ten (10) business days.

### 3.3 Points of Contact

The following points of contact for the execution of this Agreement are: